**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

---

Angela Robin Lipps,

Plaintiffs,

v.

The City of Fargo and Lucas Heck, acting in his individual capacity,

Defendants.

Case No.
**Complaint**

Jury Trial Demanded
Fed. R. Civ. P. 38(b)

---

For her Complaint, Plaintiff Angela Lipps ("Lipps") states and alleges as follows:

## INTRODUCTION

1. In July 2025, Angela Lipps was surrounded by armed agents and forcibly taken from her town in Tennessee. Lipps had no idea why she was being taken into custody or what would happen to her. She would spend the next six months in jail facing charges of bank theft in North Dakota.

2. Lipps had never been to North Dakota. Lipps did not commit the bank theft that police were investigating. Lipps did not look like the suspect captured on surveillance video. Lipps had no transactions, records, or other materials suggesting that she was in North Dakota or had anything to do with the thefts. No witnesses from the banks identified Lipps as a potential suspect.

3. A police investigator in West Fargo, North Dakota used AI facial recognition technology to find leads for the suspect in the thefts. Lipps's social media photo came up as a potential lead. The West Fargo investigator declined to request a warrant for Lipps knowing

that there was insufficient evidence to connect her to the offenses that occurred half the country away from where she lived.

4. Indeed, it has been well-known that AI facial recognition technology has shortcomings and often produces false positives. Vendors of AI recognition facial technology have disclaimers on their products noting that the results should not be relied upon and that potential leads must be corroborated with other evidence. Numerous stories have circulated throughout the country of people wrongly identified and arrested due to false positives generated by AI facial recognition technology. Police policies, including for West Fargo and the State of North Dakota, prohibit officers from relying exclusively on AI facial recognition results. Instead, officers are directed to use the materials as a potential lead and corroborate the potential lead with additional evidence.

5. Flouting these known issues with AI facial recognition technology, Fargo Police Department ("FPD") Detective Lucas Heck received information from West Fargo and North Dakota that Angela Lipps was a potential lead identified by AI facial recognition technology. Heck knew that Lipps resided in Tennessee and had no known connection to North Dakota. Heck knew that Lipps did not match the physical description of the suspect on the video surveillance videos. Heck knew that Lipps had no known connection to the bank thefts, such as unaccounted and unexplained funds. Heck refused to conduct further investigation, such as requesting and reviewing Lipps's financial or travel records. Heck did not see if bank tellers would pick Lipps independently with non-suggestive identification techniques. Had Heck done any of this additional investigation, he would have received information that Lipps had nothing to do with the bank thefts.

6. Instead, FPD Detective Heck requested an arrest warrant for Lipps. Heck knew that agents would apprehend Lipps at his request, detain her, and extradite her to North Dakota, where Lipps would face charges that carried years in prison. Heck was able to do this because the FPD lacked policy, training, and supervision that prevented officers from acting on unreliable and insufficient AI facial recognition technology, unlike West Fargo and the State of North Dakota. The FPD had used facial recognition results in other matters before and used them again here, disregarding the harm that would come to innocent people wrongly charged, like Lipps.

7. At Heck's request, Lipps was detained at gunpoint, held in jail for six months, and forced to appear in North Dakota on charges where she was threatened with being imprisoned for years. Lipps ultimately produced bank records that showed that she was in Tennessee at the time of the thefts, and her case was dismissed. Lipps was released into the freezing cold of Fargo on Christmas Eve with no way to get home to Tennessee.

8. Due to the false charges, Lipps experienced traumatic conditions in the jails. She struggled with the fear of not knowing when she would be released or whether she would end up wrongly convicted and imprisoned for years. She missed family birthdays. She spent her own birthday incarcerated, separated from her family. She missed holidays with her loved ones, including Thanksgiving and Christmas. While in custody, she was denied basic care, such as her medications and her dentures. When she was released, she found that her residence, car, and personal property were lost while she was absent. Since the incident, she lives in fear that she will be abducted again and has been left with the knowledge that even though she was innocent, she is not safe.

9. Lipps brings this claim to repair what has been broken. She should not have been arrested. She should not have been imprisoned or extradited. She should not have been charged. She should not be left with lasting hardships and trauma that might be managed but never erased. She also seeks accountability for Detective Heck and the FPD. They knew that AI facial recognition technology should not be used as the sole basis to extradite and charge a person. Yet they ignored those issues and gave no care to the harm it would do to innocent people like Lipps. As AI facial recognition technology becomes more accessible and widespread, Lipps hopes that her case will cause officers to use appropriate care and consider the harm their actions can have on those who are wrongly accused.

## PARTIES, JURISDICTION, AND VENUE

10. Plaintiff Angela Robin Lipps is a citizen of Tennessee. She is a grandmother and a lifelong resident of Tennessee. Lipps was falsely accused of criminal activity in North Dakota. Lipps had never traveled to North Dakota before she was extradited in custody to answer for false charges.

11. Defendant City of Fargo is a municipality incorporated in the State of North Dakota. The FPD is an agency of the City of Fargo.

12. Defendant Lucas Heck ("Heck") is, upon information and belief, a citizen of North Dakota. Heck served as a detective in the FPD at all material times. Heck acted under color of state law at all material times. He is sued in his individual capacity.

13. Lipps brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331

and 1343(a)(3). These statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

14. State-law claims stated herein arise from the same case or controversy as the claims providing original jurisdiction. Supplemental jurisdiction over those claims is appropriate pursuant to 28 U.S.C. § 1367(a).

15. Events giving rise to this action occurred in Fargo, North Dakota. Venue is proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### *Fargo Police Investigate Bank Fraud Incidents*

16. In April and May 2025, a woman assumed identities of legitimate accountholders to fraudulently obtain money from Fargo, North Dakota-area banks.

17. The woman used false identification to perpetrate the scheme.

18. The woman was captured on surveillance recordings in multiple incidents.

19. The woman used false identification and false personal information to fraudulently obtain funds from area banks.

20. The FPD investigated these incidents.

21. Similar incidents occurred in West Fargo, North Dakota. The West Fargo Police Department ("WFPD") investigated those incidents.

22. Defendant Heck was a detective at the FPD during this time.

23. Heck investigated multiple bank fraud incidents that appeared to involve the same suspect.

24. As part of this investigation, Heck received facial recognition data from WFPD Analyst Nicholas Gomez ("Gomez").

25. Heck reported that Gomez used facial recognition software, which indicated that Lipps was a possible lead for further investigation.

26. Gomez also stated that the North Dakota State and Local Intelligence Center ("NDSLIC") had used facial recognition software and obtained a similar result.

27. Upon information and belief, WFPD and NDSLIC both used Clearview AI ("Clearview") for facial recognition processing.

***AI Facial Recognition is Known to Produce False and Inaccurate Identifications***

28. Clearview's product information states that it "may return a set of potential leads, which the investigator is required to independently verify by both peer review and other means, before continuing with their investigation."[1] It further states that Clearview "may be used to help identify persons of interest, in addition to other methods of identification."[2]

29. Clearview does not allow public access to its product and only allows "vetted law enforcement and government agencies that have been reviewed and approved by Clearview AI's legal department to ensure compliance with due diligence standards."[3]

30. Clearview has made statements recognizing issues others have experienced with facial recognition accuracy.

---

[1] Clearview AI FAQs, https://www.clearview.ai/faq, accessed May 28, 2026.

[2] *Id.*

[3] *Id.*

31. Clearview has made statements recognizing that its facial recognition system does not have perfect accuracy and is susceptible to making inaccurate identifications.

32. Clearview states that it has systems in place to ensure that its technology is not misused. These include "peer review of search results, mandatory user training, […] and requiring customers to train their own users and establish facial recognition usage policies."[4]

33. The issue of inaccurate AI facial recognition was well known before May 2025.

34. Multiple municipalities have banned or restricted facial recognition due to the harm that relying on its results can cause.

35. Multiple publications published stories on known issues of false identifications arising from the use of AI facial recognition.

36. A November 2023 *New Yorker* article warned that AI facial recognition is essentially an "'algorithmic best guess' […] whose accuracy may vary depending on the quality of the probe photograph, which can be compromised by factors such as lighting and camera angle."[5] The article described multiple cases in which a person was wrongly named as a suspect due to inaccurate facial recognition AI.

[4] *Id.*

[5] Eyal Press, *Does A.I. Lead Police to Ignore Contradictory Evidence?*, THE NEW YORKER, Nov. 13, 2023, https://www.newyorker.com/magazine/2023/11/20/does-a-i-lead-police-to-ignore-contradictory-evidence.

37. In January 2025, *The Washington Post* published an article describing instances in which law enforcement officers improperly relied on facial recognition and failed to conduct a proper investigation.[6]

38. In February 2025, the *North Dakota Monitor* published an article recognizing issues of false arrests due to inaccurate facial recognition identifications and describing legislative efforts to restrict and regulate facial recognition use.[7]

39. The WFPD was aware that facial recognition produced unreliable results. Captain Randy Burkhartsmeier stated that facial recognition is "close to a last-ditch effort" when used for investigations.[8] WFPD restricts access to the facial recognition system to two specially trained officers.[9]

40. WFPD has a policy restricting and regulating facial recognition use for investigations. Policy 610.7.1 states that facial recognition "shall be considered an investigative lead only and not a positive identification of any person or utilized solely as the basis for engaging in any law enforcement action." It furthers states that facial recognition

---

[6] Douglas MacMillan, David Ovalle, and Aaron Schaffer, *Arrested by AI: Police ignore standards after facial recognition matches*, THE WASHINGTON POST, Jan. 13, 2025, https://www.washingtonpost.com/business/interactive/2025/police-artificial-intelligence-facial-recognition/.

[7] Paige Gross, *Facial recognition in policing is getting state-by-state guardrails*, NORTH DAKOTA MONITOR, Feb. 2, 2025, https://northdakotamonitor.com/2025/02/02/facial-recognition-in-policing-is-getting-state-by-state-guardrails/.

[8] Matt Henson, *West Fargo police say AI facial recognition is a 'last-ditch' tool*, INFORUM, Mar. 27, 2026, https://www.inforum.com/news/west-fargo/west-fargo-police-say-ai-facial-recognition-is-a-last-ditch-tool.

[9] *Id.*

results "do not represent definitive confirmation of an identity match or non-match." Officers are required to use "additional investigative means and resources" to identify or connect a person to an investigation.

41. WFPD Policy 610.9 prohibits officers from arresting an individual solely based on facial recognition results.

42. Upon information and belief, FPD investigators relied on facial recognition data and results in multiple investigations before May 2025.

43. Although FPD itself did not have in-house facial recognition software, investigators relied on other agencies, such as WFPD and NDSLIC, to conduct facial recognition searches and provide results.

44. In May 2025, it was well known that AI facial recognition did not produce reliable identifications. It was well known that facial recognition results should not be used as the sole investigative data to support a positive identification. It was well known that multiple subjects had been improperly identified, arrested, and prosecuted based on unreliable AI facial recognition results.

45. Issues relating to improper identification due to facial recognition systems were obvious before May 2025.

46. The North Dakota Bureau of Criminal Investigation includes a disclaimer on facial recognition results that states that facial recognition results "should only be considered an investigative lead and is not to be considered a positive identification of any subject."[10]

[10] Rob Port, *Port: The Angela Lipps fiasco shows a desperate need for artificial intelligence laws in North Dakota*, INFORUM, Mar. 30, 2026,

The results state that any connection to an investigation "must be corroborated through further investigation and resources."[11]

47. Despite FPD's use of facial recognition results and known issues with using facial recognition systems, FPD did not have any policy regulating facial recognition use in May 2025.

48. Upon information and belief, FPD did not provide any training to investigators regarding appropriate use of facial recognition data in or before May 2025.

49. Upon information and belief, FPD did not supervise its investigators to ensure that facial recognition data was handled in accordance with the originating agency's policies, manufacturer policies, or generally accepted practices to prevent improper identification in or before May 2025.

***FPD improperly relies on Facial Recognition to Identify and Charge Lipps***

50. Despite known issues with facial recognition, FPD Detective Heck represented that Lipps was positively identified by facial recognition results obtained from WFPD and NDSLIC.

51. Heck asserted that Lipps was identified using facial recognition systems. Heck omitted material exculpatory information that the facial recognition results were not, in fact, a positive identification. They were merely a lead that required additional corroboration and were insufficient to connect Lipps to the investigation on their own.

---

https://www.inforum.com/opinion/columns/port-the-angela-lipps-fiasco-shows-a-desperate-need-for-artificial-intelligence-laws-in-north-dakota.

[11] *Id*.

52. Heck failed to corroborate the lead provided by facial recognition systems. Heck did not conduct a non-suggestive identification with eyewitnesses to confirm whether Lipps could be the suspect.

53. Heck was aware that Lipps was a resident of Tennessee and had no known connections to North Dakota. In fact, Lipps had never traveled to North Dakota. Heck ignored the exculpatory evidence that Lipps lived in a different part of the country and had no geographic connection to where the incidents occurred. Heck did not conduct any investigation to address this issue.

54. Heck did not conduct any investigation into whether Lipps had received proceeds from the incidents. Heck did not investigate whether Lipps had any unusual or unexplained funds. In fact, if Heck had investigated Lipps's financial records, he would have found that transactions placed Lipps in Tennessee at the time of the bank fraud incidents.

55. Heck ignored that Lipps did not physically match the suspect on the surveillance video. An officer described the suspect as a larger female. Lipps does not have a large build. Lipps's facial features do not match those of the suspect on the surveillance video. Lipps has a tattoo on the back of her neck that is not present on the suspect in the surveillance videos.

56. The surveillance video was insufficiently detailed to allow a particular identification. The suspect's facial features cannot be discerned with clarity. Instead, Heck relied on general physical features that did not meaningfully narrow down the pool of potential suspects. The surveillance video shows an adult white female with medium/long blonde/brown hair. This general description is not particular enough to identify a specific

suspect. Further, it is not particular enough to identify a potential suspect halfway across the country from North Dakota.

57. Upon information and belief, the surveillance video images of the suspect did not result in the alleged identification of Lipps. Upon information and belief, the photo on the suspect's false identification card was used as the source for the facial identification result.

58. The identification used by the suspect was known to be a false document. It is unknown whether the photograph on the false identification was even the suspect herself.

59. Heck failed to report that the manner of the identification was unreliable or whether there were issues that prevented the suspect's face on the surveillance video from being used as a source for facial identification due to low image quality or other issues.

60. WFPD did not seek charges against Lipps based on the facial recognition results. WFPD understood that the facial recognition results themselves were insufficient to support probable cause for charging. WFPD did not obtain additional evidence to corroborate Lipps as a suspect.

61. WFPD reported that FPD has used WFPD's facial recognition system multiple times. When WFPD shares facial recognition results with FPD, WFPD understands that FPD will engage in additional investigation and not solely rely on the facial recognition results.

62. FPD Detective Heck did not engage in additional investigation or corroborate Lipps's connection to the incidents after receiving the facial recognition results.

63. On June 2, 2025, Heck submitted statements that there was probable cause to charge Lipps with multiple felonies due to the bank fraud incidents in North Dakota. Heck submitted these statements even though there was no probable cause to charge Lipps. Heck

misrepresented the facial recognition results and omitted material exculpatory information and his failure to corroborate Lipps's connection to the incident through other evidence.

64. On June 30, 2025, the State of North Dakota charged Lipps with eight felonies relating to the bank fraud incidents based on Heck's false and misleading reports. The most severe charges had maximum sentences of ten years imprisonment.

65. A nationwide warrant was issued for Lipps's arrest.

***Lipps is arrested in Tennessee***

66. On July 14, 2025, the United States Marshals Smokey Mountain Fugitive Task Force set out to arrest Lipps based on the North Dakota warrant.

67. Lipps went to her neighbor's residence to watch her neighbor's children.

68. Someone knocked on the neighbor's door. The neighbor answered the door. The person at the door said that they had lost a dog. After a short conversation, the person at the door walked away.

69. Immediately afterward, the neighbor said, "What the hell is this?" The neighbor's child said that people were outside with guns.

70. Lipps became scared and went to the window.

71. Lipps heard people shouting for her to come out with her hands up.

72. Lipps saw about a dozen people that she later learned were officers outside the residence. The officers appeared to be wearing plain clothes. Some officers had vests.

73. Multiple officers were pointing guns at Lipps.

74. Lipps walked outside the residence with her hands up.

75. Lipps thought she was about to die. Lipps thought that she was being kidnapped. Lipps did not understand that the people outside the residence were actually law enforcement.

76. One the men shouted something about North Dakota.

77. Many neighbors were outside watching the situation.

78. An officer grabbed Lipps's arms and put them behind her back.

79. Officers held Lipps at gunpoint as she walked outside until she was put into handcuffs.

80. Another officer continued shouting something about North Dakota.

81. Lipps did not understand what was going on. She thought that this must be some kind of mistake.

82. Lipps was hyperventilating and crying. Officers yelled at her to stop crying. Officers seemed irritated that Lipps was crying and upset.

83. At the time, Lipps did not have her dentures in. Lipps asked officers if they could get her dentures and phone so that she could have them later when she needed. The officers would not collect them for her.

84. Lipps was concerned that she would be unable to eat and would have other issues due to not having her dentures.

85. Officers told Lipps she was a fugitive from justice from North Dakota. Officers treated Lipps in an accusatory manner as if she were guilty of the North Dakota offenses.

86. Lipps asked what was going on. An officer told her that if she would "shut the fuck up and stop crying" they would explain the situation to her. Lipps tried to calm down, but officers never explained the situation to her.

87. Agents brought Lipps to a church where they switched vehicles. At the church, there were marked vehicles and officers in uniform. Officers then brought Lipps to the Carter County Detention Center.

88. During the ride, the handcuffs were tight and caused pain. Lipps's nose was runny and her hair was sticking to her face. Lipps asked an officer to help, but the officer would not help her.

89. Lipps asked about what was going on and was concerned that she would not have medicine.

90. Lipps could not stop crying. A woman at the jail asked Lipps to calm down. Lipps tried.

91. An officer started reading the North Dakota warrant documents to Lipps. Lipps was distraught and could not understand why she had been arrested. The officer read the document quickly, and Lipps could not understand why she was being detained.

92. On July 14, 2025, Cass County personnel notified local law enforcement in the Fargo area that Lipps had been arrested in Tennessee.

93. Lipps was held in custody because of the North Dakota warrant.

94. Carter County Detention Center was in lockdown nearly all day. Lipps sat in her cell nearly all the time. She mostly slept and passed the time.

95. Lipps did not have her dentures while in custody. Eating was difficult without her dentures. Lipps would break food down with her hands so that she could eat it.

96. One guard teased Lipps and gave her the nickname "North Dakota." Lipps denied that she did anything, and he would mock her. The officer's treatment made Lipps angry and ashamed.

97. While in custody, Lipps expected that someone would identify the mistake and that she would eventually be released from custody. Lipps thought someone stole her identity and used it to commit the crimes.

98. At the time, Lipps was on probation due to prior criminal conduct in Tennessee.

99. Lipps was alleged to have failed to update her address or report as required by probation.

100. In July 2025, Lipps was not trying to conceal her location from law enforcement. Lipps had recently updated her driver's license with her current address.

101. On June 19, 2025, Lipps spoke with a Carter County Sheriff's Office officer about a dog that attacked her. Lipps provided her true name and contact information to the officer. The officer did not take any action against Lipps at that time, as the North Dakota warrant had not yet issued.

102. The North Dakota charges were used as a separate basis to allege probation violations for Lipps.

103. Lipps disputed that she committed the acts alleged by North Dakota. Lipps and her family tried to get information to Lipps's attorney to prove that Lipps was not involved in the North Dakota incident.

104. Because of the North Dakota charges, Lipps's resolution of her probation violation matters was delayed.

105. Lipps understood that she was going to prison for eight years due to the North Dakota charges.

106. Lipps remained incarcerated while the probation violation files were pending.

107. In September 2025, Lipps reached an agreement to resolve the probation violations based on her failure to report only. Lipps disputed the North Dakota allegations and would not agree to a resolution in which she would have to falsely admit that she was involved in the North Dakota bank fraud.

108. In October 2025, Lipps's probation matters in Tennessee were fully resolved, and Lipps flew to North Dakota to appear for the criminal charges.

109. When the morning came for Lipps to be transported from Tennessee, she prayed that she would be released and that the North Dakota matter would be resolved.

110. Cass County Sheriff's Office deputies met Lipps at the Carter County Jail. The deputies asked Lipps if she had ever flown before. Lipps said that she had never flown. The deputies tried to reassure Lipps that the flight would be okay. The deputies explained that Lipps would not receive any drinks and had limited use of the restroom while she was being transported.

111. Lipps was transported in handcuffs and restraints with two officers with her. Many people stared at Lipps. Lipps was humiliated. She tried to keep her head down and avoid eye contact with others.

112. Lipps was scared of flying. It was a new experience and Lipps did not know how safe airplanes were or how the experience would go.

113. Lipps was relieved, though, to get onto the plane and leave the terminal. That allowed her to get away from the people staring at her at the terminal.

114. During a connection, officers told others that Lipps was pregnant so that they could get to the next flight on time. Lipps was embarrassed and offended that they told others that she was pregnant when she was not.

115. When Lipps arrived in North Dakota, she thought that this was the end. She thought that she would never return to Tennessee and that she would never see her family again. She thought that everything in her life was gone. She prayed that this nightmare would end, but it did not.

116. Lipps had never been to North Dakota. Lipps knew no one in the area and had no connections to that area.

117. Lipps was transported in custody and delivered to the Cass County Jail.

118. Lipps still believed that someone had stolen her identity and that the North Dakota charges would be resolved once that mistake was revealed.

***Lipps defends herself against False Charges***

119. Lipps made an initial appearance in North Dakota on October 31, 2025.

120. Lipps tried to explain that she had never been to North Dakota and that she wanted to be released so that she could see her family.

121. The judge considered Lipps a flight risk and imposed a $100,000 bond.

122. Lipps applied for and received a public defender to represent her.

123. Lipps could not pay the $100,000 bond that was imposed, and she was held in custody in Cass County Jail for the duration of her North Dakota prosecution.

124. Lipps had trouble sleeping and needed medication to help her sleep. Lipps was troubled by the constant noise and the other inmates, so she tried to sleep in her cell for most of the time she was in custody.

125. Lipps had her cell searched and was strip searched during one incident.

126. Lipps had trouble eating food in custody. Lipps still did not have her dentures, and the quality of the food was terrible.

127. Lipps was in custody over Thanksgiving. It was the first Thanksgiving that she did not spend with her family. Lipps had a heavy heart because she could not see her grandchildren.

128. Lipps missed celebrating her children's birthdays because she was in custody.

129. Lipps spent her 50th birthday in custody. She had hoped to have a big celebration for it, but instead she spent it in a jail cell in North Dakota.

130. Lipps understood that the State of North Dakota was seeking at least eight years of prison for the alleged offenses.

131. Eventually, Lipps was able to produce bank records that showed that she was in Tennessee at the time of the alleged offenses.

132. Lipps and her attorney sat for an interview with the local prosecutor and Detective Heck after the records were produced.

133. Heck asked about issues related to the thefts, such as the use of cryptocurrency. Lipps knew nothing about that or other topics.

134. Heck asked Lipps if she participated in the thefts. Lipps adamantly denied any involvement.

135. Lipps asked to see the videos of the suspect, so she could see what the suspect looked like. Heck would not share the videos or images of the suspect.

136. After the meeting, Lipps was still confused about the situation. Lipps thought the prosecution was going to continue.

137. On December 24, 2025, Lipps went to court. Lipps learned that charges against her were dismissed by the prosecutor.

138. Lipps went back to a holding cell at Cass County Jail.

139. Lipps was released from Cass County Jail without resources to get home. Lipps did not know how she was going to get home. Other inmates told Lipps that she could get a bus ticket that would take Lipps to a shelter where she could get additional help getting home.

140. Lipps asked for and received a jacket from the jail. The jacket was better than not having one, but Lipps was released in lightweight clothing that she was wearing in July in Tennessee, when she was arrested. The weather outside was below freezing, with a low of ten degrees that evening.

141. Lipps's clothes were unwashed and smelled terribly.

142. The jail gave Lipps $0.04 when she was released.

143. Some representatives from the F5 Project, a local nonprofit, were waiting for Lipps when she was released. They told her that they would help her get home.

144. They took Lipps to a store to get a temporary cell phone. They got Lipps a room at a motel. Lipps spent Christmas Eve alone in that motel room.

145. Lipps's family celebrated Christmas without Lipps.

146. A member of the F5 Project drove Lipps to Chicago.

147. The neighbor who was with Lipps when she was arrested met Lipps in Chicago and brought her home to Tennessee.

***The Unlawful Prosecution harmed Lipps***

148. The wrongful prosecution of Lipps caused substantial harm.

149. Lipps was arrested at gunpoint without warning and without any understanding why she was being taken into custody by the Smokey Mountain Fugitive Task Force.

150. Lipps was detained and deprived of her liberty while Tennessee proceedings occurred related to extradition and the alleged probation violation arising from the charges from North Dakota.

151. Lipps was transported to North Dakota, where she had never been before, and held in custody over Thanksgiving until she was released on Christmas Eve without an adequate winter coat, a place to sleep, or a way to get home.

152. Due to these and other circumstances of her apprehension, incarceration, and prosecution, Lipps suffered significant trauma and emotional distress. While the matter was pending, Lipps suffered anxiety, fear, and intense sadness. Lipps believed that she would be incarcerated for years and unable to ever return to Tennessee or her family.

153. Lipps missed multiple family events, such as a celebration of her 50th birthday, family birthdays, Thanksgiving, and Christmas due to the unlawful prosecution.

154. Lipps suffered physically during the prosecution. She did not have her dentures or medications while in jail. The conditions of her incarceration caused her physical pain and discomfort.

155. When Lipps was released, she found that her residence, car, and personal property were lost while she was absent.

156. Since the incident, Lipps continues to suffer emotional distress. Lipps has continuing trauma, anxiety, and panic attacks. She does not trust law enforcement or strangers. She is no longer social. She has general paranoia. She constantly fears for her safety and liberty. She has received treatment for these conditions, but they persist.

157. During her prosecution and following its dismissal, Lipps's reputation has been significantly harmed. Lipps has been accused of committing fraudulent criminal acts that she could not have done.

158. FPD and its agents have refused to accept responsibility or apologize to Lipps despite multiple requests for them to do so.

159. FPD statements suggested that credible evidence connected Lipps to the bank fraud incidents despite the false facial recognition identification. No such evidence existed.

160. FPD statements suggest that investigation into Lipps is continuing and that evidence exists to support such an investigation and potential charges in the future. No such evidence exists.

161. FPD statements suggest that the prosecutor and court independently found probable cause to support criminal charges against Lipps, which justified FPD's investigation and conduct. The prosecutor and court's actions were based on false and misleading representations by FPD and its officers, and probable cause to charge Lipps does not exist based on the true evidence.

162. FPD has refused to acknowledge that Lipps was wrongly charged based on false and misrepresented evidence. FPD has refused to fully clear Lipps of suspicion despite the absence of credible evidence connecting Lipps to the bank fraud.

163. Due to these statements, Lipps's reputation remains damaged, and Lipps unfairly remains under a cloud of suspicion.

164. FPD has made statements suggesting that its investigation was in progress when Lipps was brought to custody in North Dakota. FPD has suggested that it obtained additional exculpatory information from Lipps as soon as possible and that charges were dismissed shortly thereafter.

165. These suggestions are false. The investigative file does not suggest any efforts by FPD to investigate Lipps's location or bank records or corroborate her identification by facial recognition with witnesses or other non-suggestive identification techniques. Further, it appears that North Dakota law enforcement was timely notified when Lipps was taken into custody in Tennessee. No efforts appear to have been made to corroborate through additional investigation that Lipps was in North Dakota or received unexplained funds during the relevant timeframe.

***The Public Learns of Lipps's Situation***

166. Following the December 2025 dismissal of Lipps's charges, FPD should have been aware that significant misconduct occurred in Lipps's matter.

167. Upon information and belief, FPD undertook no corrective actions, including disciplinary investigations or modifications of its policies, immediately following the dismissal of Lipps's charges.

168. In March 2026, a Fargo reporter named Matt Henson published a news story on Lipps's proceedings.

169. When the public learned of Lipps's proceedings, there was widespread and universal condemnation of FPD's investigation and practices.

170. Initially, FPD refused to comment on Lipps's situation.

171. Then, FPD asserted that its conduct was proper and that Lipps was appropriately charged and detained based on credible evidence.

172. After public scrutiny of FPD continued, FPD changed its position.

173. In a March 24, 2026 press conference, former FPD Chief Dave Zibolski claimed that executives at FPD were unaware that WFPD facial recognition was being used in investigations.[12]

174. Zibolski stated that the facial recognition system should not have been used and had since been prohibited.[13] Zibolski admitted that FPD's reliance on WFPD's facial recognition results was an issue in Lipps's investigation.[14]

175. Zibolski stated that FPD staff would now be trained in understanding facial recognition returns and submissions.[15]

---

[12] Fargo Police Department Press Conference, Mar. 24, 2026, available at https://www.youtube.com/watch?v=lqiI_JJfKo0 at 3:54.

[13] *Id*. at 4:04.

[14] *Id*. at 4:19.

[15] *Id*. at 4:37.

176. Zibolski admitted that FPD "identified a couple of errors in terms of [the] investigative process."[16]

177. Zibolski appeared to state that WFPD had used the suspect's fake ID as the source for facial recognition, not the surveillance video showing the true appearance of the suspect.[17] Zibolski admitted that the photo on the fake ID may not have been a photo of the suspect.[18]

178. Zibolski said that images from the surveillance videos had been recently submitted to NDSLIC, which resulted in additional leads.[19] Zibolski admitted that FPD should have done this initially as part of their investigation.[20]

179. Zibolski outlined new FPD directives and policies to ensure that facial recognition results were used responsibly.[21]

---

[16] *Id*. at 5:36.

[17] *Id*. at 6:19.

[18] *Id*.

[19] *Id*. at 7:32.

[20] *Id*. at 7:20.

[21] *Id*. at 9:45.

180. Following the press conference, Zibolski admitted that FPD "made investigative errors."[22] Zibolski stated that FPD was "committed to being transparent about where [FPD] fell short[.]"[23]

## CAUSES OF ACTION

### Count 1 – 42 U.S.C. § 1983 – Fourth Amendment Violations Involving Unlawful Seizure and Arrest
### *Defendant Heck*

181. Plaintiff Lipps realleges paragraphs 1-180 of this Complaint as if fully stated herein.

182. Defendant Heck acted under color of state law while performing the acts described herein.

183. Defendant Heck deprived Lipps of her Fourth and Fourteenth Amendment rights through the actions described herein, including, but not limited to the conduct listed below.

184. Heck reported false and misleading statements to support charges and the arrest of Lipps.

185. Heck falsely suggested that facial recognition systems had identified Lipps.

---

[22] Austin Erickson, *Cass Co. Sheriff & West Fargo Police Chief share concerns about not being part of Fargo Police's Angela Lipps press conference*, WZFG THE FLAG, Mar. 25, 2026, https://www.am1100theflag.com/news/cass-co-sheriff-west-fargo-police-chief-share-concerns-about-not-being-part-of-fargo-polices-angela-lipps-press-conference/.

[23] *Id.*

186. Heck failed to disclose that the source of the recognition was not the surveillance images of the suspect but, instead, a fake ID used by the suspect that may not have contained an actual photograph of the suspect.

187. Heck failed to disclose that facial recognition systems did not produce positive identification of suspects.

188. Heck failed to disclose that facial recognition results require independent investigative corroboration to connect a suspect to an investigation.

189. Heck failed to disclose that Lipps's physical appearance did not match the suspect seen on the surveillance recordings.

190. Heck failed to disclose that Lipps was a resident of Tennessee and had no known connection or travel to North Dakota.

191. Heck failed to disclose that Lipps was not found to have any unexplained or suspicious proceeds that may have been obtained from the bank fraud transactions.

192. Heck failed to disclose that WFPD officers did not consider the evidence sufficient to connect Lipps to the bank fraud incidents.

193. The evidence available to Heck did not establish even arguable probable cause that Lipps could have committed the bank fraud.

194. Despite the absence of arguable probable cause, Heck submitted reports and filings that caused Lipps to be criminally charged and detained.

195. Due to Heck's actions, Lipps was unlawfully prosecuted and detained.

196. Heck's actions violated constitutional rights that were clearly established at the time.

197. Heck acted with evil intent or reckless indifference to Lipps's rights.

198. Heck subjected Lipps to deprivations of her rights in such a manner as to render Heck liable for punitive damages.

199. As direct and proximate result of the acts of Heck, Lipps suffered injuries and other harms that entitle her to damages.

200. The manner in which Heck deprived Lipps of her rights supports an award of punitive damages, which are necessary to deter further improper conduct.

201. Lipps is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count 2 – 42 U.S.C. § 1983 – Fourteenth Amendment Violations of Due Process**
***Defendant Heck***

202. Plaintiff Lipps realleges paragraphs 1-180 of this Complaint as if fully stated herein.

203. Defendant Heck acted under color of state law while performing the acts described herein.

204. Defendant Heck deprived Lipps of her Fourteenth Amendment Due Process rights through the actions described herein including, but not limited to, the conduct listed below.

205. Defendant Heck deprived Lipps of her due process rights by issuing false reports and material misstatements regarding the evidence supporting the prosecution.

206. Heck falsely suggested that facial recognition systems had identified Lipps.

207. Heck failed to disclose that the source of the recognition was not the surveillance images of the suspect but, instead, a fake ID used by the suspect that may not have contained an actual photograph of the suspect.

208. Heck failed to disclose that facial recognition systems did not produce positive identification of suspects.

209. Heck failed to disclose that facial recognition results require independent investigative corroboration to connect a suspect to an investigation.

210. Heck failed to disclose that Lipps's physical appearance did not match the suspect seen on the surveillance recordings.

211. Heck failed to disclose that Lipps was a resident of Tennessee and had no known connection or travel to North Dakota.

212. Heck failed to disclose that Lipps was not found to have any unexplained or suspicious proceeds that may have been obtained from the bank fraud transactions.

213. Heck failed to disclose that WFPD officers did not consider the evidence sufficient to connect Lipps to the bank fraud incidents.

214. Heck's false statements and misrepresentations were material. If Heck had accurately reported known evidence, Lipps would not have been charged, arrested, required to defend against the prosecution.

215. Heck's actions violated constitutional rights that were clearly established at the time.

216. Heck acted with evil intent or reckless indifference to Lipps's rights.

217. Heck subjected Lipps to deprivations of her rights in such a manner as to render Heck liable for punitive damages.

218. As direct and proximate result of the acts of Heck, Lipps suffered injuries and other harms that entitle her to damages.

219. The manner in which Heck deprived Lipps of her rights supports an award of punitive damages, which are necessary to deter further improper conduct.

220. Lipps is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count 3 – *Monell* Civil Rights Violation**
***Defendant City of Fargo***

221. Plaintiff Lipps realleges paragraphs 1-180 of this Complaint as if fully stated herein.

222. Before and during May 2025, FPD had a custom and practice in which officers would use facial recognition data without adhering to known guardrails and regulations.

223. Upon information and belief, FPD officers would treat facial recognition results as positive identification instead of investigative leads. FPD officers would not corroborate facial recognition leads with independent investigation and evidence. FPD officers would misrepresent the nature and reliability of facial recognition results to establish probable cause where none otherwise existed. FPD officers would omit material exculpatory information regarding the use and results of facial recognition results or the resulting investigation.

224. The improper use of facial recognition by FPD officers was documented in reports and observable by FPD policymakers. FDP policymakers deliberately ignored the misuse of facial recognition technology by its officers.

225. Despite known and obvious risks of relying on facial recognition results, FPD had no policy, training, or supervision to ensure that its officers used facial recognition results responsibly.

226. When Lipps was investigated, neighboring agencies, such as WFPD, had facial recognition policies. Municipalities across the country had restricted or regulated the use of facial recognition systems by law enforcement. Clearview had materials explaining the risks and issues that can arise when facial recognition systems are not used properly. NDSLIC included disclaimers and warnings on facial recognition materials sent to agencies, such as FPD.

227. Despite the obvious risks of misuse of facial recognition results and knowledge that FPD officers were using facial recognition without sufficient training, supervision or guidance, FPD allowed its officers to request and use facial recognition results in investigations in deliberate disregard of the constitutional rights of the subjects of investigations.

228. FPD knew that Lipps's identification was incorrect when her charges were dismissed. Despite this knowledge, FPD undertook no action to prevent inaccurate identification again or to discipline or correct the officers involved in the investigation before Lipps's matter was publicly reported.

229. The FPD's failure to correct or discipline those involved supports that the investigation was tacitly approved by FPD leadership.

230. FPD's general policies allowing facial recognition technology to be used without restriction allowed its officers to arrest and seek the prosecution of subjects in violation of the subjects' constitutional rights.

231. FPD was aware that facial technology could result in the improper detention and prosecution of a subject if an officer did not receive sufficient training on its use. Despite knowledge of this risk, FPD refused to provide adequate training to its officers to ensure that facial recognition results would be used in accordance with a subject's constitutional rights.

232. FPD was aware that the lack of supervision of an officer using facial recognition in an investigation could result in the wrongful detention and prosecution of a subject. Despite knowledge of this risk, FPD refused to supervise its officers' use of facial recognition technology in a criminal investigation.

233. Lipps was injured due to the improper customs, failure to supervise, failure to train, and FPD policies.

234. As a direct and proximate result of the acts of the defendant, Lipps suffered injuries and other harm that entitle her to damages.

235. Lipps is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count 4 – False Arrest and Imprisonment**
***Defendant City of Fargo and Lucas Heck***

236. Plaintiff Lipps realleges paragraphs 1-180 of this Complaint as if fully stated herein.

237. Lipps was arrested and imprisoned without legal basis.

238. Heck understood that probable cause did not exist for Lipps to be arrested and detained.

239. Heck ignored, concealed, and misrepresented exculpatory evidence that Lipps did not commit the bank thefts.

240. Heck relied upon and misrepresented facts, such as facial recognition results, that were neither sufficient nor reliable to establish probable cause upon which to arrest and detain Lipps.

241. Despite knowledge that Lipps's arrest would be unlawful and in violation of her rights, Heck procured an arrest warrant.

242. Heck acted maliciously and in deliberate disregard to Lipps's rights and the evidence available to him.

243. Due to Heck's actions, Lipps was unlawfully arrested and imprisoned.

244. Lipps suffered harms, including, but not limited to, physical pain and emotional distress, due to her arrest and loss of liberty.

245. When Heck committed these actions, he was employed by the Fargo Police Department, which is an agency of the City of Fargo.

246. The City of Fargo is liable for the actions of Heck based upon *respondeat superior* and vicarious liability.

**Count 5 – Malicious Prosecution**
***Defendant City of Fargo and Lucas Heck***

247. Plaintiff Lipps realleges paragraphs 1-180 of this Complaint as if fully stated herein.

248. Heck made representations and undertook conduct to initiate a criminal prosecution against Lipps.

249. Based on Heck's statements and actions, a prosecution was initiated against Lipps.

250. All charges against Lipps were dismissed.

251. Heck sought the criminal prosecution of Lipps despite the absence of evidence supporting probable cause that Lipps committed the alleged crimes.

252. Heck sought the criminal prosecution without probable cause maliciously and in deliberate disregard to Lipps's rights.

253. Lipps was harmed due to the malicious prosecution initiated by Heck.

254. When this conduct occurred, Heck was employed as an FPD officer. The FPD is an agency of the City of Fargo.

255. The City of Fargo is liable for the actions of Heck based upon *respondeat superior* and vicarious liability.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff, Angela Lipps, prays for judgment as follows:

1. That the Court find that the defendants committed acts and omissions alleged herein;

2. A money judgment against the defendants for compensatory damages, together with costs, and prejudgment interest;

3. As to Defendant Heck, a judgment for punitive damages and reasonable attorneys' fees under 42 U.S.C. § 1988;

4. For such other and further relief as this Court may deem just and equitable.

**JURY DEMAND**

The plaintiff, Angela Lipps, demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Date: September 15, 2026

**RINGSTROM DEKREY PLLP**

Dane DeKrey (ND #09524)
814 Center Ave., Ste. 5
Moorhead, MN 56560
P: (218) 284-0484
dane@ringstromdekrey.com

**LAW OFFICE OF ERIC A. RICE, LLC**

Eric A. Rice (MN #0388861)
1 W. Water St., Ste. 275
St. Paul, MN 55107
P: (651) 998-9660
F: (651) 344-0763
eric@ricedefense.com

*Attorneys for Plaintiff*